# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CIVIL NO. 3:05CV520-H

| | |
|---|---|
| GLENNA SHELTON, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>THE CHARLOTTE-MECKLENBURG )<br>HOSPITAL AUTHORITY, d/b/a )<br>CAROLINAS HEALTHCARE )<br>SYSTEM d/b/a CAROLINAS MEDICAL )<br>CENTER, )<br>)<br>Defendant. )<br>) | **MEMORANDUM AND ORDER** |

**THIS MATTER** is before the Court on the "Defendant's Motion for Summary Judgment [with attached exhibits]" (document #15) and "Memorandum in Support..." (document #16), both filed October 30, 2006; and the Plaintiff's "Affidavit ..." (document #17) and "Memorandum in Opposition [with attached exhibits] ..." (document #18) filed November 15, 2006. On November 27, 2006, the Defendant filed its "Reply ..." (document #19).

The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c), and this motion is now ripe for disposition.

Having carefully considered the parties' arguments, the record, and the applicable authority, the undersigned will grant the Defendant's Motion for Summary Judgment.

## I. PROCEDURAL AND FACTUAL BACKGROUND

This is an action for damages and declaratory relief under the Americans with Disabilities Act ("the ADA") 42 U.S.C. § 12112, et. seq.. The Defendant Charlotte-Mecklenburg Hospital

Authority, d/b/a Carolinas Healthcare System d/b/a Carolinas Medical Center ("CMHA"), is a North Carolina hospital authority organized under state law with its primary place of business in Charlotte, Mecklenburg County, North Carolina.

The Plaintiff, Glenna Shelton, presently resides in Tennessee but resided in Charlotte during her employment by the Defendant, which began on October 1, 2001, when Plaintiff was hired as a "Secretary III" position in "Materials Management." Sometime in July 2002, the Plaintiff sought a transfer to the Security Department where she was hired as a Staff Assistant, which included receptionist duties. Within weeks of her hiring, Steven Curtis became Plaintiff's direct supervisor.

On May 29, 2003, the Plaintiff applied for and received unpaid leave under the Family Medical Leave Act ("FMLA") for gall bladder surgery. In total, the Plaintiff used approximately 120 hours of FMLA leave as a result of her gall bladder surgery. Approximately one month later, the Plaintiff returned to her position, and she testified in her deposition that her job "went right back to the way everything was," that is, that she had no physical limitations or restrictions upon her return.

Unfortunately, in October 2003, the Plaintiff was diagnosed with Stage IV breast cancer, and tests performed in November 2003 confirmed that the cancer had metastasized into her lymph nodes and liver. The Plaintiff was placed on chemotherapy, and on November 25, 2003, she applied for "intermittent leave" under the FMLA, which began on December 15, 2003. In the light most favorable to the Plaintiff, she gave Mr. Curtis advance notice of her scheduled treatments. Although the parties dispute the exact number of hours of FMLA leave the Plaintiff used through April 8, 2004 due to chemotherapy treatments and resulting side effects, in the light most favorable to the Plaintiff, she missed work "periodically," that is, an average of 14.5 hours per week, including missing an entire week of work in February 2004 when she was hospitalized due to severe dehydration.

It is undisputed that when the Plaintiff <u>was</u> able to attend work, the Defendant modified her job requirements in an attempt to accommodate the side effects of the chemotherapy, particularly the Plaintiff's diminished immune system. Mr. Curtis hired a temporary employee to perform the Plaintiff's receptionist duties and the Plaintiff was moved to a room away from the reception area where she would not interact with the public. Mr. Curtis also reassigned a number of Plaintiff's other responsibilities to other employees in the Security Department.

On April 8, 2004, and based on a note from her oncologist stating that she would be "totally disabled" from working from April 5 "through August 2004," the Plaintiff requested that she be placed on FMLA "continuous leave." In a May 1, 2004 letter, the Plaintiff's doctor shortened the requested leave period, indicating that the Plaintiff would be able to return to work on August 1, 2004. At the time she began continuous leave, the Plaintiff was being paid a wage of $15.21 per hour, plus benefits.

Sometime in April or early May 2004, the Plaintiff began receiving short-term disability benefits through the Defendant's employee benefit plan.

The parties disagree as to when the Plaintiff's eligibility for unpaid FMLA leave expired, the Defendant contending that her leave was consumed on April 21, 2004, while the Plaintiff contends that because the Defendants improperly counted two holidays as days the Plaintiff had been absent from work, she actually had FMLA leave available through April 23, 2004.

In any event, the Plaintiff's FMLA eligibility had long expired prior to June 7, 2004, the date, in the light most favorable to the Plaintiff, that Mr. Curtis told her that because she had exhausted her FMLA leave, her Staff Assistant position would be "posted," that is, the Defendant would solicit

3

applicants to fill the position.[1] Mr. Curtis then referred the Plaintiff to the Defendant's Return to Work Department for assistance in re-applying for her Staff Assistant position or another position with the Defendant once she was able to return to work.

On June 23, 2004, the Plaintiff's oncologist released her to return to work on July 1, 2004, without restrictions, except that Plaintiff would continue to receive chemotherapy treatments and had she been working, would have continued to miss work at least intermittently.

On June 24, 2004, the Defendant formally terminated the Plaintiff from her Staff Assistant position, effective April 21, 2004, but consistent with its employee policies, the Defendant retained the Plaintiff as an "active employee" in the CMHA system so that she continued to receive employee benefits, including short-term disability benefits and health insurance.[2]

On June 27, 2004, the Plaintiff's former position was filled through the transfer of an unidentified co-worker who the Plaintiff alleges had no "history of disability."

In the light most favorable to the Plaintiff, on June 29, 2004, she contacted Vondra Love in the Return to Work department and informed her that she (the Plaintiff) could begin working again. Ms. Love told the Plaintiff that there were then no suitable positions available but that the Plaintiff could remain an "active employee" for 60 days while she applied and interviewed for any open positions that arose during that period. The Plaintiff alleges that she applied for at least 15

---

[1] The parties have not addressed in their briefs the total amount of leave the Plaintiff was eligible to take, but appear to agree that the FMLA's general provision of 12 weeks (480 hours) in any 12-month period was applicable. See 29 U.S.C. §§ 2612(a)(1), 2614(a)(1) (employees covered by FMLA may take "a total of 12 workweeks of leave during any 12-month period" for health-related matters and have a right "to be restored by the employer to the position of employment [or an equivalent position] held by the employee when the leave commenced").

[2] As the Plaintiff notes in her brief, the Defendant's Human Resources Policy 3.09 provides that an employee on medical leave under the FMLA "may be granted additional leave up to six months without job protection as an accommodation under the Americans with Disabilities Act." Exhibit 47 to Plaintiff's "Memorandum in Opposition" (document #18) (emphasis in original).

4

positions. It is undisputed that she interviewed for 6 positions but was not offered any of them, and that she declined an interview for a seventh position.

At the same time the Plaintiff was interviewing internally with the Defendant, she was also seeking alternative employment, and on August 16, 2004, was offered and accepted a position with Specialty Manufacturing. The Plaintiff states in her brief that she has worked continuously since September 2004, but has offered no evidence as to what, if any, accommodations she requires in order to be able to work.

On September 17, 2004, the Plaintiff filed an administrative charge of wrongful termination in violation of the ADA with the Equal Employment Opportunity Commission ("EEOC"), which on September 23, 2005, issued the Plaintiff what is commonly called a "right to sue" letter.

On November 30, 2004, the Defendant formally terminated the Plaintiff.

Sometime in December 2004, the Plaintiff moved to Tennessee, where she presently works as a receptionist earning $16.25 per hour.

On December 15, 2005, the Plaintiff filed her Complaint, alleging one claim for wrongful termination in violation of the ADA, which as the Plaintiff clarifies in her brief, presents a single issue: whether the ADA requires an employer to continue the unpaid leave of an employee whose eligibility for FMLA leave has expired but who remains unable to attend work regularly due to illness.

On October 30, 2006, and following the close of discovery, the Defendant filed its "Motion for Summary Judgment" (document #15), which has been fully briefed as set forth above and is ripe for disposition.

## II. DISCUSSION OF CLAIMS

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be granted when the pleadings, responses to discovery, and the record reveal that "there is no genuine issue as to any material fact and. . . the moving party is entitled to a judgment as a matter of law." See also Charbonnages de France v. Smith, 597 F.2d 406 (4th Cir. 1979). Once the movant has met its burden, the non-moving party must come forward with specific facts demonstrating a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). However, the party opposing summary judgment may not rest upon mere allegations or denials and, in any event, a "mere scintilla of evidence" is insufficient to overcome summary judgment. Id. at 249-50.

When considering summary judgment motions, courts must view the facts and the inferences therefrom in the light most favorable to the party opposing the motion. Id. at 255; Miltier v. Beorn, 896 F.2d 848 (4th Cir. 1990); Cole v. Cole, 633 F.2d 1083 (4th Cir. 1980). Indeed, summary judgment is only proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotations omitted).

The ADA provides as follows:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).

In order to prove an ADA wrongful termination claim, an employee may proceed under ordinary principles of proof using direct or indirect evidence, or under the paradigm for indirect proof of employment discrimination set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Rhoads v. FDIC, 257 F3d. 373, 387 (4th Cir. 2001) (applying McDonnell-Douglas burden-shifting to ADA case).

To overcome a summary judgment motion based upon direct or indirect evidence of discrimination, the plaintiff "must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact." Brinkley v. Harbour Recreation Club, 180 F. 3d 598, 607 (1999), quoting Goldberg v. B. Green & Co., Inc., 836 F.2d 845, 848 (4th Cir. 1988). The plaintiff must provide "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." Id., citing Fuller v. Phipps, 67 F.3d 1137, 1142 (4th Cir. 1995).

It is undisputed that in this case, the Plaintiff has offered neither direct nor indirect evidence of the Defendant's alleged purpose to discriminate. However, in the absence of such direct or indirect evidence, "the plaintiff may nevertheless proceed under McDonnell Douglas." Id.

Generally speaking, under McDonnell-Douglas, if the employee establishes a prima facie case of illegal discrimination (as discussed below), then the burden shifts to the employer to articulate some legitimate, non-discriminatory reason for its employment decision. 411 U.S. at 802. If the employer does so, the presumption of discrimination "drops from the case" and the employee must demonstrate that the employer's stated reason for its action was in fact a pretext for improper discrimination. Id. at 804.

The Supreme Court has made clear that the plaintiff at all times "bears the ultimate burden

of proving ... intentional discrimination." Runnebaum v. NationsBank of Maryland, 123 F.3d 156, 164 (4th Cir. 1997) (en banc), citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-11 (1993) (holding that a prima facie case plus disbelief of employer's asserted justification for employment action is not necessarily sufficient to establish a violation and that, in such cases, summary judgment is appropriate unless the plaintiff presents adequate evidence that the employer unlawfully discriminated).

In order to state a prima facie case of wrongful discharge under the ADA, the Plaintiff must show: (1) she was a qualified individual with a disability; (2) she was discharged; (3) she was fulfilling her employer's legitimate expectations at the time of discharge; and (4) the circumstances raise a reasonable inference of unlawful discrimination. Rohan v. Networks Presentations LLC, 375 F.3d 266, 272 (4th Cir. 2004) (where plaintiff could not establish she was "qualified individual with a disability," district court need not address other elements of ADA termination claim).

An individual is "disabled" if she "(A) [has] a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) [has] a record of such an impairment; or (C) [has been] regarded as having such an impairment." 42 U.S.C. § 12102(2). "[T]hese terms need to be interpreted strictly to create a demanding standard for qualifying as disabled." Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 197 (2002) (medical conditions, including carpal tunnel syndrome, that caused employee to avoid sweeping, to stop dancing, to occasionally seek help dressing, and to reduce how often she played with her children, gardened, and drove long distances did not amount to such severe restrictions in activities that were of central importance to most people's daily lives that they would establish a disability under ADA). Accord Rohan, 375 F.3d at 273.

Moreover, an individual must offer evidence that the limitation caused by the impairment "prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives" and that the impact of the impairment is "permanent or long-term." Toyota Motor Mfg., Ky., Inc., 534 U.S. at 198. Accord Lochridge v. City of Winston-Salem, 388 F. Supp. 2d 618, 625 (M.D.N.C. 2005) (where employee's diabetes, asthma and allergies did not have long-term impact on ability to work, employer's motion for summary judgment granted), citing Toyota Motor Mfg., Ky., Inc., 534 U.S. at 198.

The Plaintiff has not cited any published authority holding that the impairments resulting either from her illness or from the side effects of her treatment amounted to a "disability" for ADA purposes. To the contrary, it is well settled in the Fourth Circuit that illnesses that resulted in even a complete inability to work for periods greater than the Plaintiff suffered here do not amount to a disability. See, e.g., Pollard v. High's of Baltimore, Inc., 281 F.3d 462, 467-472. (4th Cir. 2002) ("nine month absence is insufficient to demonstrate that [plaintiff] had a permanent or long term impairment that significantly restricted a major life activity"); Halperin v. Abacus Technology Corp., 128 F.3d 191, 199 (4th Cir. 1997) (concluding that seven month recovery from cerebral hemorrhage that impaired plaintiff's ability to work was of too short a duration to be "substantially limiting"); and Farrish v. Carolina Commercial Heat Treating, Inc., 225 F. Supp. 2d 632, 636 (M.D.N.C. 2002) (employee who could not regularly attend work over six month period due to treatments for breast cancer and whose FMLA leave had expired was not "disabled" under the ADA). See also Heintzelman v. Runyon, 120 F.3d 143, 145 (8th Cir. 1997) (holding plaintiff's year-long recovery from back surgery did not substantially limit the major life activity of working); and Schwertfager v. City of Boynton Beach, 42 F. Supp. 2d 1347, 1360 (S.D.Fla. 1999) (physical limitations for a five

9

month period following reconstructive surgery did not constitute a disability). In Pollard, the Fourth Circuit further stated that a physician's note indicating the plaintiff would be able to resume her full duties was "persuasive evidence" that the impairment was merely temporary. 281 F.3d at 469.

In other words, rather than establish that she was "disabled" for ADA purposes, the fact that the Plaintiff missed work completely for three months and intermittently for another six months prevents her from carrying her burden of proving that she was a "qualified individual with a disability," that is, someone who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). In ADA cases generally, a plaintiff may satisfy this requirement by producing evidence that: (1) he could "perform the essential functions of the job" or (2) if not, that " a reasonable accommodation by [his] employer would enable [him] to perform those functions." Tyndall v. National Educ. Ctrs., Inc., 31 F.3d 209, 213 (4th Cir. 1994), quoting Chandler v. City of Dallas, 2 F.3d 1385, 1393-94 (5th Cir. 1993).

It is clearly established in the Fourth Circuit, however, that an employee who cannot attend work regularly is not "qualified" for her position for ADA purposes. Halperin, 128 F.3d at 197 (an employee who is not able to come to work regularly is not a "qualified individual" under the ADA); Tyndall, 31 F.3d at 213 (employee who suffered lupus erythematosus and missed 40 days of work in seven month period due to that condition was not "otherwise qualified" for her position under ADA); Payne v. Fairfax County, ___ F. Supp. 2d. ___, ___ (E.D. Va. November 1, 2006) ("employee who cannot meet the attendance requirements of his job cannot perform the essential functions of his job, and, therefore, cannot be a 'qualified individual' under the Americans with Disabilities Act," granting summary judgment employer's motion for summary judgment on ADA

termination claim); and Farrish, 225 F. Supp. 2d at 636 (employee who could not regularly attend work due to treatments for breast cancer was not "qualified" for her job under the ADA). See also Carr v. Reno, 23 F.3d 525, 529 (D.C.Cir. 1994) (holding that "coming to work regularly" is an "essential function" under ADA); Jackson v. Veterans Admin., 22 F.3d 277, 279-80 (11th Cir. 1994) (holding that an employee with a history of sporadic unpredictable absences was not otherwise qualified); and Law v. United States Postal Serv., 852 F.2d 1278, 1279-80 (Fed.Cir. 1988) (holding that a regular and reliable level of attendance is a necessary element of most jobs).

Put differently, courts have consistently held that the ADA does not require employers to make a "reasonable accommodation" of allowing an employee to be absent from work, even when the absence results from the allegedly disabling condition. See, e.g., Halperin, 128 F.3d at 197; Tyndall, 31 F.3d at 213 ("[i]n addition to possessing the skills necessary to perform the job in question, an employee must be willing and able to demonstrate these skills by coming to work on a regular basis"); Carr, 23 F.3d at 529; Jackson, 22 F.3d at 279-80; Law, 852 F.2d at 1279-80; Payne, ___ F. Supp. 2d. at __; and Farrish, 225 F. Supp. 2d at 636.

Indeed, in Payne, the Honorable James C. Cacheris recently held that the only accommodation the plaintiff, who suffered, among other things, a panic disorder, sought was "simply ... to ensure that he could miss work without losing his job ... [which would have] effectively relieve[d] Plaintiff from the need to perform the essential function of coming to work and doing his job, and therefore, it cannot be a reasonable accommodation." Payne, __ F. Supp. 2d at ___. As Judge Cacheris went on to note, not only could such a plaintiff not make out a prima facie case of ADA wrongful termination, the plaintiff had failed to show that the ADA was applicable in the first instance. Id.

In short, where the evidence taken in the light most favorable to the Plaintiff establishes that she missed work due to illness on an intermittent basis for six months and continuously for three months, she was not a "qualified individual with a disability" within the meaning of the ADA, and the Defendant's Motion for Summary judgment must and will be granted.

Moreover, even assuming that the Plaintiff could at this point in the proceedings establish that her illness amounted to a disability that left her "otherwise qualified" for her job, she has not pointed to any "circumstances raising a reasonable inference of unlawful discrimination," the fourth element of her prima facie wrongful discharge claim, Rohan, 375 F.3d at 272, much less carried her "ultimate burden of proving intentional discrimination." Runnebaum, 123 F.3d at 164. Rather, the record establishes that when the Plaintiff did request what otherwise would have amounted to a reasonable accommodation under the ADA, the Defendant cooperated fully. In response to her chief difficulty – concerns that her diminished immune system made contact with the general public unadvisable – her supervisor, Mr. Curtis, moved her to a workstation away from the reception area, hired a temporary employee to serve as receptionist, and re-assigned some of Plaintiff's other responsibilities to her co-workers. Finally, although the Defendant terminated the Plaintiff from her position once her FMLA leave expired, it retained her as an "active employee" for an additional six months which enabled her to retain her employee benefits. For these further reasons as well, the Defendant's Motion for Summary Judgment will be granted.

### III. ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:**

1. The "Defendant's Motion for Summary Judgment" (document #15) is **GRANTED** and the Complaint is **DISMISSED WITH PREJUDICE.**

2. The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties.

**SO ORDERED, ADJUDGED AND DECREED**.

Signed: November 29, 2006

_____
Carl Horn, III
United States Magistrate Judge